### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Barbara Ferkel, Adrienne Green-Katien, Charles Saporito, Craig Johnson, Mishela Torres-Riley, and Francisco Otero, individually and on behalf of all similarly situated persons, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 11 C 09322 |
| v. | ) ) | Judge Edmond E. Chang |
| Board of Education of the City of Chicago, | ) ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Barbara Ferkel, Adrienne Green-Katien, Charles Saporito, Craig Johnson, Mishela Torres-Riley, and Francisco Otero filed this lawsuit on behalf of themselves and a proposed class of similarly situated Chicago Public School teachers against the Chicago Board of Education, alleging age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, violation of their constitutional due-process rights under 42 U.S.C. § 1983, and common-law breach of contract.[1] R. 77, Third Am. Compl. The Board now moves to dismiss the due-process and breach-of-contract claims under Federal Rule of Civil Procedure 12(b)(6). R. 91, Mot. Dismiss. For the reasons explained below, the Board's motion is denied in part and granted in part.

---

[1] The Court has subject matter jurisdiction over this case based on 28 U.S.C. §§ 1331, 1343, and 1367.

## I. Background

In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in Plaintiffs' favor. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011). Plaintiffs were tenured Chicago Public School (CPS) teachers. *See* Third Am. Compl. ¶¶ 2, 83. All of them formerly taught at Ames Middle School. *Id.* ¶¶ 10, 18, 32, 38, 42, 45, 48. In October 2008, the Board adopted a Middle Grades Specialization Policy (Specialization Policy). *Id.* ¶ 50; R. 77-2, Pls.' Exh. B, Specialization Policy. The Specialization Policy required that CPS students in the sixth through eighth grades receive instruction in language arts, math, science, and social studies from teachers who either (1) possess a "middle grades content endorsement" in those subjects, or (2) through the 2010-2011 school year only, "ha[ve] been authorized by the Illinois State Board of Education to teach those [subjects] pending completion of required course work and [are] making annual progress toward completing endorsement requirements." Specialization Policy § I.A. The day after the Board adopted the Specialization Policy, then-CPS Chief Executive Officer Arne Duncan sent a letter to CPS teachers stating that the Board had adopted the Specialization Policy and reiterating that all CPS middle school teachers would be required to have proper middle-grade endorsements no later than the beginning of the 2011-2012 school year. Third Am. Compl. ¶ 51; R. 77-3, Pls.' Exh. C, Duncan Letter. By the summer of 2010, Plaintiffs either already had middle-grade endorsements or were in the process of completing them. Third Am. Compl. ¶¶ 20, 33, 39-40, 43, 46, 49.

Then, on June 15, 2010, the Board passed a resolution authorizing the "honorable termination" of tenured CPS teachers. *Id.* ¶ 83. Soon after, the media began reporting that Ron Huberman, who was at that time CPS's Chief Executive Officer, and the Board would lay off "unsatisfactory" teachers first, instead of basing layoffs solely on seniority. *See id.* ¶ 53; *see also* R. 77-4, Pls.' Exh. D, Huberman Article at 1. On August 10, 2010, Plaintiffs were informed that they would be honorably terminated from CPS effective August 31, 2010. Third Am. Compl. ¶ 55. Plaintiffs allege that Huberman's statements that honorably terminated teachers were performing unsatisfactorily are false. *Id.* ¶ 54. Indeed, several of the Plaintiffs had received positive professional evaluations, ranging from "Excellent" to "Superior." *See id.* ¶¶ 17, 22, 31, 45; *see also id.* ¶ 35 (alleging that Green-Katien received a "Satisfactory" rating during the 2009-2010 school year). But when Thomas Hoffman, Ames Middle School's principal, called to tell Plaintiffs about their termination, he informed two of them that they were being terminated because they did not have certain middle-grade endorsements. *Id.* ¶¶ 21, 56-57. A few days later, Plaintiffs received letters from CPS's Office of Human Capital advising them that their positions were no longer available because of "Redefinition." *Id.* ¶ 58; R. 77-5, Pls.' Exh. E, Termination Letters.

Plaintiffs then sued the Board. They have alleged that the Board's failure to provide proper pre-layoff procedures—such as an individualized hearing on each teacher's qualifications for existing vacancies—constituted a violation of their constitutional right to due process, because as tenured CPS teachers, they had a

property interest in continued employment. *See* Third Am. Compl. ¶¶ 84, 87-90, 92, 105-113. Plaintiffs have also alleged that the Board breached the contract it made with Plaintiffs, the contract being formed, allegedly, by the adoption of the Middle Grades Specialization Policy and the issuance of the Duncan Letter. *Id.* ¶ 123. Plaintiffs believe that the Policy and Letter represent a promise from the Board that it would maintain the status quo on middle-grade-specialization requirements through July 2011 and provide Plaintiffs until that date to complete all required endorsements. *Id.* ¶ 120. The Board now moves to dismiss both the due-process and the breach-of-contract claims.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of*

*Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

### A. Due-Process Claim

Plaintiffs, all of whom were tenured teachers, allege that the Board deprived them of their protected property interest in continued employment in violation of the Due Process Clause by summarily dismissing them without individualized determinations of their qualifications, certifications, experience, and performance ratings. Third Am. Compl. ¶¶ 65, 69, 88, 105-107. Plaintiffs also allege that they were entitled to be considered for open, alternative, or even temporary positions in the CPS system before being laid off. *Id.* ¶¶ 74-76, 89-92, 109. The Board, however, argues that Plaintiffs' due-process claim should be dismissed because Plaintiffs have failed to identify a constitutionally protected property interest and thus have failed to state a claim upon which relief can be granted. R. 91, Def.'s Br. at 3, 5-8.

To prevail on a claim for the deprivation of property without due process, a plaintiff must establish that she holds a protected property interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Property interests are not created

by the Constitution, but instead "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* (internal quotation marks and citation omitted). So the federal Constitution will *protect* property from government deprivations without due process, but the federal Constitution does not *create* the property interest.

Property interests may arise from statutes, regulations, municipal ordinances, or from an express or implied contract, such as "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Covell v. Menkis*, 595 F.3d 673, 675-76 (7th Cir. 2010) (internal quotation marks and citation omitted). An individual has a property interest in a benefit if she has more than an "abstract need" for, or "unilateral expectation" of, that benefit. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). In other words, the individual must have a "legitimate claim of entitlement to it." *Id.* In the employment context, a property interest exists "when an employer's discretion is clearly limited so that the employee cannot be denied employment unless specific conditions are met." *Buttitta v. City of Chicago*, 9 F.3d 1198, 1202 (7th Cir. 1993) (internal quotation marks and citation omitted). Once a court determines that an individual holds a property interest protected by the Due Process Clause, the question becomes what process is due. *Loudermill*, 470 U.S. at 541.

In their Third Amended Complaint, Plaintiffs identify four potential sources that they believe create constitutionally protected property interests. First, Plaintiffs point to section 34-84 of the Illinois School Code, which they believe

creates a property interest in "tenured and continued employment." Third Am. Compl. ¶¶ 87-88, 105, 110. Second, Plaintiffs also believe that section 34-18(31) of the School Code entitles them to "individualized consideration . . . of the qualifications, certifications, experience, performance ratings or evaluation[s], or any other factor relating to an employee's job performance." *Id.* ¶¶ 65, 106-107, 110. Next, Plaintiffs allege that they had a property interest in seniority-based layoff procedures and an interest in reinstatement or participation in a reassignment pool under Board Report 07-1219-PO1, Section 504.2 (Reassignment Policy). *See id.* ¶¶ 69-70, 78, 108, 110. Finally, Plaintiffs also allege that the Board's Middle Grades Specialization Policy and the Duncan Letter to teachers created a due-process right to obtain middle-grade endorsements and to retain their positions until July 2011. *Id.* ¶¶ 111-113. The Court will consider each of these asserted sources in turn, but in reverse order.

As a preliminary matter, Defendants argue that Plaintiffs' due-process allegations related to these last two potential property interests—those created by the Specialization Policy and the Reassignment Policy—are untimely. *See* Def.'s Br. at 4 n.3. But in response, Plaintiffs correctly note that both of these claims are timely under the relation-back doctrine. R. 92, Pls.' Resp. Br. at 6-7. Under Federal Rule of Civil Procedure 15(c), "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B); *see also Henderson v.*

*Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001) ("Generally, an amended complaint in which the plaintiff merely adds legal conclusions or changes the theory of recovery will relate back to the filing of the original complaint if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading." (internal quotation marks and citation omitted)). The relation-back doctrine applies here because Plaintiffs' new allegations in the Third Amended Complaint all arise out of the same core factual allegations as in the original complaint—Plaintiffs' dismissals. The Board argues that relation back does not apply because Plaintiffs' new allegations about the Specialization and Reassignment Policies are new *facts*, not new substantive *claims*. *See* R. 97, Def.'s Reply Br. at 8. But that reading of the complaint is too technical. *Cf. Woods v. Ind. Univ.-Purdue Univ. at Indianapolis*, 996 F.2d 880, 884 (7th Cir. 1993) (explaining that relation back "has its roots in the equitable notion that dispositive decisions should be based on the merits rather than technicalities"). The Board had notice as of Plaintiffs' original complaint that Plaintiffs were challenging their dismissals, and these two Policies simply support two additional theories of recovery for Plaintiffs' due-process claim. In short, these claims arise from the same transaction or occurrence as the original complaint and are therefore timely.

### 1. Specialization Policy

Even though Plaintiffs' allegations related to the Specialization and Reassignment Policies are not time-barred, they fail to identify constitutionally protected property interests that arise from these Policies. Turning first to the

Specialization Policy, Plaintiffs believe that the Policy and the Duncan Letter both set a clear deadline—July 2011—for them to attain middle-grade endorsements. As a result, Plaintiffs argue that they had a property interest in not facing specialization-based dismissals until *after* that deadline. *See* Pls.' Resp. Br. at 6; *see also* Third Am. Compl. ¶¶ 111-112, 120. This argument does not square with the language of either the Policy or the letter. Both documents clearly stated that the Policy would go into effect *starting* with the 2009-2010 school year, and nothing in the documents states that the *completion* of the Policy's roll-out is some sort of binding grace period. *See* Specialization Policy § II; Duncan Letter ("The Middle Grade Specialization Policy will be phased-in beginning in July 2009 and continue through June 2011."). And neither the Policy nor the Letter makes any promises about continued employment, as discussed more fully below. Instead, they explain that obtaining endorsements in certain subject areas is a necessary, but not sufficient, condition for continued employment. There is absolutely no guarantee that teachers with those endorsements will have an unqualified right to continue teaching. Therefore, the Specialization Policy and Duncan Letter do not create a property interest protected under the Due Process Clause.

## 2. Reassignment Policy

The Reassignment Policy likewise falls short in creating a property interest. This Policy spells out a series of steps that the Board must take when a teacher is laid off because of a school or program closure, a drop in enrollment, a change in educational focus at a school, or when a school is subject to remediation or

intervention. *See* R. 77-7, Pls.' Exh. G, Reassignment Policy § 1 ("Scope of Policy"). These steps include giving notice to the teacher, providing the teacher with a list of vacancies, giving the teacher thirty days to interview for other positions, and possible reassignment or interim appointments. *See id.* §§ 3-7. The Board believes that the Reassignment Policy does not create a property interest because the "Scope of the Policy" limits the Policy to only four narrow circumstances that—with one exception for Green-Katien, discussed below—do not apply in this case. *See* Def.'s Br. at 6-7. Plaintiffs were discharged because their positions were no longer available because of "redefinition," and "redefinition" was not one of the actions that triggered the Policy. *See* Termination Letters; Reassignment Policy § 1.

But the Reassignment Policy falls short for a more fundamental reason: it only lays out a set of notice, removal, and reassignment *procedures*; it does not establish a property *interest* that those procedures are designed to protect. As explained above, process is due only if Plaintiffs first establish that they have a protected property interest. *See Loudermill*, 470 U.S. at 538. It does not work the other way around. Plaintiffs cannot point to a set of procedures and argue that the procedures in and of themselves create a property interest. *See Heck v. City of Freeport*, 985 F.2d 305, 311 (7th Cir. 1993) ("Mere procedural rights . . . do not of themselves give rise to property interests protected under the Fourteenth Amendment."). In other words, Plaintiffs can have no property interest in procedures; they can only have an interest in property. And the Reassignment Policy does not create a property interest; it only establishes procedures.

The factual circumstances underlying Plaintiff Green-Katien's due-process claim are slightly different from the factual basis for the other Plaintiffs' claims. Green-Katien was an art teacher at Ames, and her employment was terminated because Principal Hoffman closed the art program. Third Am. Compl. ¶¶ 32, 63. Therefore, as Plaintiffs point out, the reason for Green-Katien's termination—program closure—fell within the scope of the Reassignment Policy. *See* Pls.' Resp. Br. at 6.

But even though Green-Katien's factual circumstances are different, the legal analysis that applies to her claim is the same. It is true, as Plaintiffs note, that the district court in *Waddy v. Board of Education* held that the same Reassignment Policy created a constitutionally protected property interest for teachers who were laid off during a school remediation or "turnaround." No. 10 CV 6158, 2012 WL 6060932, at *1, 4-5 (N.D. Ill. Dec. 6, 2012). But *Waddy* did not grapple with the important distinction between property interests and procedures. As discussed above, the Due Process Clause only protects property interests; the Clause does not mandate that state-law-created procedures are themselves protected. Instead, only after a plaintiff establishes a property interest does the Due Process Clause demand some procedural protection before (or sometimes after) depriving the plaintiff of that property interest. At that point, the question becomes what procedures are due, and the answer to that question is provided by the familiar three-factor *Mathews v. Eldridge* standard. *See* 424 U.S. 319, 334-35 (1976) (establishing a three-factor balancing test to decide what procedures are due). Therefore, here,

Green-Katien must still identify a source that establishes a right to continued employment when a program closes—that is, a property interest—and not just a set of procedures that CPS or the Board might have adopted for when a program closes.

In certain circumstances, it is possible that promised procedures could be evidence of a protected property interest if, for example, the procedures were mandatory and detailed and, when read in context, gave rise to the promise of the underlying property interest. But because Plaintiffs have not made this argument, the Court need not consider it now.[2] Even assuming the procedures are evidence of a protected property interest, Green-Katien would still not be entitled to the procedures themselves as a matter of federal constitutional law. Instead, the Board could follow any set of procedures that passes muster under *Mathews v. Eldridge*'s balancing test; it would not necessarily have to follow its own prescribed procedures. *Cf. Head v. Chi. Sch. Reform Bd. of Trs.*, 225 F.3d 794, 805 & n.10 (7th Cir. 2000) (explaining that employee must only receive "*constitutionally* adequate process," not necessarily the procedures provided under state law).

Finally, Plaintiffs also argue that Green-Katien was deprived of due process because the closure of the art program was "bogus." Pls.' Resp. Br. at 1, 5. As they allege in their complaint, Hoffman closed the art program for the 2010-2011 school

---

[2]The Court will note, though, that in the public-employee context, termination procedures, in and of themselves, do not create property interests. *See Moss v. Martin*, 473 F.3d 694, 701 (7th Cir. 2007) (holding that mandatory notice procedures in an employee manual do not create a protected property interest in a job); *Heck*, 985 F.2d at 311. Similarly, in the prison-litigation context, the Supreme Court has discouraged courts from looking to regulatory language mandating certain prison-management procedures to determine if prisoners have a liberty interest. *See Sandin v. Conner*, 515 U.S. 472, 482-84 (1995); *see also Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983).

12

year, only to reopen it the following school year and hire a new art teacher who is substantially younger than Green-Katien. Third Am. Compl. ¶ 63. Green-Katien was not contacted or invited to apply for the reopened position. *Id.* ¶ 64. But again, even if the closure was a sham, Green-Katien must still identify the source of a property interest guaranteeing employment after the program's closure. What's more, Plaintiffs' complaint does not allege, for example, that the program closure was a sham to hide Green-Katien's termination *for cause*—a fact that might have triggered due-process rights (as discussed more fully below with respect to section 34-84 of the Illinois School Code). Instead, Plaintiffs allege that the program closure was a pretext for discharging Green-Katien because of her age. *Id.* ¶ 63. Although those allegations might form the basis of Green-Katien's age-discrimination claim under the ADEA—a claim that the Board does not target in its motion to dismiss— they are not the basis for a due-process claim. Absent a threshold showing of a protectable interest in continued employment, Plaintiffs cannot proceed to an inquiry into the validity of an alleged deprivation of that employment. In short, Plaintiffs also fail to identify a property interest arising from the Reassignment Policy.

### 3. Section 34-18(31)

Plaintiffs next argue that section 34-18(31) of the Illinois School Code establishes a constitutionally protected property interest.[3] 105 ILCS 5/34-18(31).

---

[3] Section 34-18(31) states that "[t]he board . . . shall have power . . . [t]o promulgate rules establishing procedures governing the layoff or reduction in force of employees and the recall of such employees . . . . Such criteria shall take into account factors including, but not be limited to, qualifications, certifications, experience, performance ratings or

This argument fails as well. As the Court already explained when granting the Board's earlier motion to dismiss, this section of the School Code is simply an authorizing or enabling statute that gives the Board the power to promulgate layoff and recall procedures. *Price v. Bd. of Educ.*, Nos. 11 C 04463, 11 C 04974, 11 C 09322, 2013 WL 1914325, at *7 (N.D. Ill. May 8, 2013) (citing *Chi. Teachers Union, Local No. 1 v. Bd. of Educ.*, 963 N.E.2d 918, 925 (Ill. 2012)). And because the Board has chosen not to exercise its power to issue such procedures, this section of the School Code does not give tenured teachers a substantive right to individualized consideration before layoff. *Id.* at *7-8. In other words, section 34-18(31)'s list of criteria only applies if and when the Board acts on its rule-making authority, and here, the Board has chosen not to act. *Id.* at *7. What's more, section 34-18(31) would only apply to procedures that the Board established to govern layoffs, reductions in force, or recalls. And as discussed below, Plaintiffs now argue that they were not "laid off" for economic reasons, but instead were terminated for cause. Plaintiffs cannot have it both ways. If their terminations were for cause, then section 34-18(31) is no longer relevant.

### 4. Section 34-84

That leaves section 34-84 of the Illinois School Code. 105 ILCS 5/34-84. Plaintiffs assert that their status as tenured teachers under section 34-84 gave them a property interest in continued employment, which in turn entitled them to individualized hearings to review the reasons for their termination and also an

---

evaluations, and any other factors relating to an employee's job performance." 105 ILCS 5/34-18(31).

14

opportunity to demonstrate that they were qualified to fill vacancies within the CPS system. *See* Third Am. Compl. ¶¶ 87-90, 92. Section 34-84 of the Illinois School Code outlines the procedure by which a teacher achieves tenure:

> Appointments and promotions of teachers shall be made for merit only, and after satisfactory service for a probationary period . . . appointments of teachers *shall become permanent*, subject to removal for cause in the manner provided by Section 34-85.

105 ILCS 5/34-84 (emphasis added). Section 34-85, in turn, spells out the process for removing a tenured teacher for cause, including written notice of charges and a hearing. 105 ILCS 5/34-85. Thus, under Illinois law, tenured teachers may not be terminated from their jobs except for good cause. *Cf. Harbaugh v. Bd. of Educ.*, 716 F.3d 983, 986 (7th Cir. 2013).

But as *Price* already explained, section 34-84 deals only with terminating employment on some *performance*-based ground; section 34-84 says nothing about a tenured teacher's immunity from *economic* layoff. 2013 WL 1914325, at *6. Sections 34-84 and 34-85's provisions for tenure and removal do not exempt tenured teachers from being laid off; that is, a tenured teacher does not have a property interest in absolute continued employment that shields her from layoff decisions driven by economic and other budgetary factors. *Land v. Bd. of Educ.*, 781 N.E.2d 249, 256 (Ill. 2002). So notwithstanding the restrictions that section 34-84 and 34-85 place on the Board's power to *discharge* tenured teachers for cause, the Board retains discretion to *lay off* employees—even those who have achieved tenure status—in good faith for lack of work or to save money. *See Perlin v. Bd. of Educ.*, 407 N.E.2d 792, 796 (Ill. App. Ct. 1980) (citations omitted); *see also Chi. Teachers Union*, 407

15

N.E.2d at 927 (holding that section 34-84 does not give laid-off tenured teachers "a substantive right to be rehired *after an economic layoff*" (emphasis added)).

As this case law distinguishing discharges and layoffs makes clear, it is then very important to determine whether a tenured teacher's termination was motivated by a performance-based reason or an economic one. The difference determines whether process is "due" to that teacher. If the reasons driving a layoff are economic, the Board can consider employee performance and qualifications when deciding whom to lay off. Indeed, section 34-18(31) envisions that these factors would be relevant if the Board formerly adopted layoff procedures. But if the Board is targeting a tenured teacher solely for performance issues, the teacher has a protected property interest under section 34-84 and is entitled to due process.

Since the filing of the Board's previous motion to dismiss, Plaintiffs have rearticulated their due-process claim under section 34-84 so that it now survives, even though it did not survive before. *See Price*, 2013 WL 1914325, at *6-7 (granting the Board's motion to dismiss). Now, Plaintiffs do *not* allege that their terminations were economic layoffs. Pls.' Resp. Br. at 1, 4-5. Instead, they believe they were discharged because of pretextual claims about their job performance and qualifications. *Id*. at 1. Because Plaintiffs have reframed their claim, they have now articulated a constitutionally protected property interest under section 34-84.

The Board urges the Court to ignore this recharacterization of Plaintiffs' due-process claim. *See* Def.'s Reply Br. at 1-6. The Board argues that it is clear that economic reasons were the basis for the terminations. It is true that Plaintiffs'

16

terminations in the summer of 2010 occurred at the same time that budget deficits forced the Board to lay off over 1,000 teachers. *See Chi. Teachers Union*, 963 N.E.2d at 921 (noting that the Board laid off 1,289 teachers in several phases during the summer of 2010). Indeed, the Huberman Article that Plaintiffs attach to their complaint even references the Board's "estimated half-billion-dollar budget deficit." Huberman Article at 1. The Board also points out that although Plaintiffs repeatedly use the term "laid off" in their Third Amended Complaint, they never specifically allege that they were discharged "for cause." *See, e.g.*, Third Am. Compl. ¶¶ 84, 94. What's more, Plaintiffs rely heavily on section 34-18(31) of the School Code—a provision that applies only when a layoff is *not* for cause. *See* 105 ILCS 5/34-18(31) (authorizing the Board to establish procedures only for "the layoff or reduction in force of employees and the recall of such employees"). Together, these allegations do suggest that it would be reasonable to infer that economic factors contributed to Plaintiffs' terminations.

But at this stage of the litigation, the Court must draw all reasonable inferences in *Plaintiffs*' favor. *al-Kidd*, 131 S. Ct. at 2079; *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1115 (7th Cir. 2013) (recognizing that courts reviewing a Rule 12(b)(6) motion must "constru[e] factual allegations and any reasonable inferences in the light most favorable to the plaintiff"). To be sure, Plaintiffs' Third Amended Complaint could have been clearer—it is, after all, their fourth iteration of the complaint. But a generous reading of Plaintiffs' Third

17

Amended Complaint,[4] in the light most favorable to Plaintiffs, does support Plaintiffs' argument that they did allege that the Board was really discharging them for performance-based reasons. (Of course, Plaintiffs deny that they were performing inadequately, but the point is that Plaintiffs allege that the Board was really instituting what the Board believed were for-cause terminations.)

Under this light-most-favorable standard, the complaint states a due-process claim for performance-based terminations. First, Huberman allegedly let slip to the media that the Board would be basing its layoff decisions on teacher performance. Third Am. Compl. ¶ 53; Huberman Article at 1. Next, Plaintiffs allege that Huberman's statements that the terminated teachers were unsatisfactory are false. Third Am. Compl. ¶ 54. Viewed in the light most favorable to Plaintiffs then, the alleged budgetary crisis cited in the article was just a façade for the Board's pretextual performance-based layoffs. In other words, the Board said the layoffs were driven by an economic crisis so that they could avoid having to convene due-process hearings to review for-cause terminations. Similarly, Principal Hoffman told Ferkel and Saporito that they were being terminated because they did not have certain middle-grade endorsements. *Id.* ¶¶ 56-67; *see also id.* ¶ 123. Of course, one way to interpret Hoffman's comments could be that he was explaining to Ferkel and Saporito that they were being eliminated in an economic layoff because of their

---

[4]Contrary to the Board's arguments, *see* Def.'s Reply Br. at 2-4, what Plaintiffs alleged in their earlier complaints is irrelevant for deciding this present motion to dismiss. *See Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 782-83 (7th Cir. 2013) ("[W]hen a plaintiff files an amended complaint, the amended complaint supersedes the original complaint. . . . [F]acts or admissions from an earlier complaint that are not included in a later complaint cannot be considered on a motion to dismiss.").

performance and qualifications, *not* that they were eliminated only because they did not have the endorsements. But this is the pleading stage, and the Court must therefore pick the interpretation that is most favorable to Plaintiffs. Finally, and perhaps most importantly, Plaintiffs do *not* allege anywhere in their Third Amendment Complaint that their terminations were economic layoffs.

In short, Plaintiffs have stated (finally) a due-process claim that survives the Board's motion to dismiss. The narrow claim that remains is based solely on Plaintiffs' allegations that they were terminated for cause, not for economic reasons, and that they have a protected property interest only under section 34-84 of the Illinois School Code. Going forward, discovery will be limited to this narrow theory of recovery. Moreover, it will be Plaintiffs that bear the burden of actually proving that the Board really terminated them for exclusively performance-based reasons and not because of the budgetary crisis. In other words, without Rule 12(b)(6)'s light-most-favorable lens, Plaintiffs must either prove that the Board's reported budget crisis was truly a sham or that their own terminations were in no way driven by the Board's budgetary restrictions. Given the publically available statements about CPS's financial woes, as well as Plaintiffs' own previous pleadings, the Court seriously questions whether Plaintiffs will be able to prove this. The parties must carefully consider how to conduct reasonable and cost-efficient discovery on this claim, under the supervision of the able magistrate judge (to whom discovery has been referred). And Plaintiffs should be mindful of Rule 54's

cost-shifting provisions and their Rule 11 obligations. But for now, the Court denies the Board's motion to dismiss Plaintiffs' due-process claim.

### B. Breach-of-Contract Claim

In their breach-of-contract claim, Plaintiffs argue that the Specialization Policy and the Duncan Letter constitute contracts that the Board has breached. *See id.* ¶ 123. In particular, Plaintiffs believe that the Policy and Letter promised them that there would be no specialization-based discharges until July 2011. *See id.* ¶ 120. Plaintiffs allege that the Board breached this promise when Principal Hoffman told Ferkel and Saporito that they were being terminated because they did not have certain middle-grade endorsements. *See id.* ¶¶ 56-57; *see also id.* ¶ 123.

The Board presents two alternative arguments for why Plaintiffs' breach-of-contract claim fails. First, the Board argues that the Illinois Educational Labor Relations Act (IELRA), 115 ILCS 5/1 *et seq.*, preempts Plaintiffs' common-law contract claim. But Plaintiffs' breach-of-contract claim is not "preempted." "Preemption" is the constitutional-law principle, derived from the Supremacy Clause, that a federal law can supersede state or local laws that touch on fields Congress has intended to exclusively occupy ("field preemption") or that conflict with federal law ("conflict preemption"). *See generally Arizona v. United States*, 132 S. Ct. 2492, 2500-01 (2012).

Although the Court understands that the Board is trying to analogize to the preemptive effect of federal labor law, in this state-law context, it is more appropriate to ask whether the Illinois Educational Labor Relations Board (IELRB)

has exclusive jurisdiction to review Plaintiffs' contract claim. The purpose of the IELRA is "to regulate labor relations between educational employers and educational employees" and to resolve "disputes arising under collective bargaining agreements." 115 ILCS 5/1. Given the Act's targeted purpose and the need to prevent conflict between state (and federal) courts and the IELRB, Illinois courts have held that the IELRB has exclusive jurisdiction over all claims involving collective bargaining agreements (CBA), including claims for breach of such agreements. *See Bd. of Educ. v. Warren Twp. High Sch. Fed'n of Teachers, Local 504*, 538 N.E.2d 524, 529 (Ill. 1989); *Cessna v. City of Danville*, 693 N.E.2d 1264, 1268-69 (Ill. App. Ct. 1998) (citing *Bd. of Educ. v. Compton*, 526 N.E.2d 149 (Ill. 1988)). Thus, the question is not whether the IELRA displaces *all* common-law breach-of-contract claims, but instead whether Plaintiffs' contract claim involves the collective bargaining agreement between the Chicago Teachers Union and the Board. If the contract claim does involve interpreting the CBA, then the claim would fall under the IELRB's exclusive jurisdiction and it would not be proper for this Court to resolve Plaintiffs' contract claim on its merits.

The Board argues that this Court would have to interpret the management-rights clause of the CBA between the Chicago Teachers Union and the Board to resolve Plaintiffs' breach-of-contract claim. *See* Def.'s Br. at 10-11 (citing R. 91-7, Def.'s Exh. C5, CBA § 48-2, at 118). The management-rights clause exempts the Board from having to bargain over "matters of inherent managerial policy," including "such areas of discretion of policy as . . . standards of services . . . and

direction of employees." CBA § 48-2, at 118. But Plaintiffs' breach-of-contract claim is not based in any way on the CBA generally or the management-rights clause specifically.[5] Plaintiffs do not dispute that the Board was within its authority under the management-rights clause to issue the Specialization Policy. Pls.' Resp. Br. at 12. Instead, Plaintiffs claim that the Policy itself created private contractual rights that existed independent of the rights Plaintiffs have under the CBA. *See id.* at 11. Therefore, Plaintiffs' contract claim is outside the CBA, and this Court can consider it. *See Semmens v. Bd. of Educ.*, 546 N.E.2d 746, 749 (Ill. App. Ct. 1989) (holding that the IELRB did not have exclusive jurisdiction over a claim that made no mention of a CBA and instead alleged only that the employer failed to comply with the Illinois School Code).

Alternatively, even if this claim is not preempted, the Board contends that Plaintiffs have failed to state a claim that can survive a motion to dismiss. On this second point, the Court agrees with the Board. To state a breach-of-contract claim in Illinois, Plaintiffs must prove that there was a valid contract, performance by the plaintiff, breach by the defendant, and damages. *See Lindy Lu LLC v. Ill. Cent. R.R.*, 984 N.E.2d 1171, 1175 (Ill. App. Ct. 2013). Furthermore, under Illinois law, employer policy statements may create contractual rights only if the language of the policy contained a clear and definite promise. *See Duldulao v. Saint Mary of*

---

[5]The Board points out that Plaintiffs have a pending grievance against the Board. *See* Def.'s Reply Br. at 5-6. But the grievance raises issues that are independent of the breach-of-contract claim in front of this Court. As the Board recognizes, Plaintiffs' grievance alleges that the Board abused the *Reassignment* Policy (that is, Board Report 07-1219-PO1, Section 504.2), *not* the *Specialization* Policy, which is the subject of Plaintiffs' common-law contract claim in this Court. *See id.* at 5; *see also* R. 97-1, Def.'s Exh. A, Union Grievance at 2.

*Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987); *see also Academy Chi. Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991).

Plaintiffs fail to sufficiently allege the first element of a contract claim, that the Policy and Letter created a valid contract. The Board did not make any promises to Plaintiffs in either the Policy or the Letter. Plaintiffs, however, believe that section I.A.2 made a clear promise to teachers that they had until the end of the 2010-2011 school year to obtain their endorsements. Pls.' Resp. Br. at 8. Plaintiffs likewise believe that the Duncan Letter also reiterated the supposed July 2011 deadline. *Id.* But that Letter too made no clear and definite promises. Instead, it clearly stated that the Policy would "be phased-in beginning in July 2009." Duncan Letter.[6]

Altogether, the Policy and Letter were just setting out a requirement that middle school teachers for certain subjects must obtain subject-area endorsements. Section I.A.2 in particular clarified that, through the 2010-2011 school year only, "Middle Grade Content Area Specialists" would include teachers who were "authorized" by the Board to continue teaching pending the completion of required coursework and were "making annual progress toward completing endorsement

---

[6]Implying a promissory-estoppel-type claim, Plaintiffs also argue in their brief that in reliance on this alleged July 2011 deadline, they invested time and money pursuing subject-area endorsements. *See* Pls.' Resp. Br. at 2, 9. Plaintiffs may have alleged the subsidiary facts for such a claim in their complaint, *see* Third Am. Compl. ¶ 122, but they have not given the Board sufficient notice of their intent to raise such a claim because Plaintiffs do not present any explicit promissory-estoppel arguments in either their complaint or their brief. But even if Plaintiffs had presented a promissory-estoppel theory of recovery, those arguments would have also failed because an unambiguous promise is also an element of a promissory-estoppel claim. *See Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523-24 (Ill. 2009).

requirements." Specialization Policy § I.A.2. But nowhere in their complaint do Plaintiffs allege that they had obtained this required authorization. More importantly, nowhere in the Policy does it state that teachers could continue their employment if they received middle-grade endorsements or if they were making progress toward obtaining these endorsements.

Finally, even if the Policy and the Letter had created a valid contract, there are subsidiary problems with the factual allegations related to each Plaintiff. For example, although Ferkel had a social-studies endorsement and was pursuing an endorsement in language arts, she was teaching science at the time she was discharged. She does not allege that she was planning to pursue a science endorsement. *See* Third Am. Compl. ¶¶ 20, 22. In fact, she instead told Hoffman and the Board that she was planning on retiring in 2011. *See id.* ¶ 23. Next, Green-Katien had an endorsement in Art, *id.* ¶ 33, but the Specialization Policy only applied to language arts, math, science, and social studies, *see* Specialization Policy, Purpose. It is also unclear whether Saporito, Riley, and Johnson have stated a valid contract claim because Plaintiffs have not alleged what subjects these three teachers were teaching.[7] *See* Third Am. Compl. ¶¶ 37-46. Finally, Otero, who taught math, had a math endorsement, thus underscoring that even having an endorsement did not shield teachers from discharge. *Id.* ¶¶ 48-49. Therefore, even setting aside contract-formation problems, Plaintiffs have not alleged facts indicating that the Board breached any purported contract.

---

[7]It would be reasonable to infer, however, that Saporito taught language arts because Hoffman told Saporito that his employment was being terminated because he did not have a language-arts endorsement. Third Am. Compl. ¶ 57.

Ultimately, Plaintiffs have failed to state a valid common-law breach-of-contract claim, and the Court therefore grants the Board's motion to dismiss this claim.

## IV. Conclusion

For the reasons discussed above, the Board's motion to dismiss [R. 91] is denied in part for Plaintiffs' due-process claim, but granted for Plaintiffs' breach-of-contract claim. Therefore, Plaintiffs' age-discrimination claim and the specific due-process claim shall move forward.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: May 28, 2014

25